United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BERRYESSA FOR ALL,<br><br>    Plaintiff,<br><br>  v.<br><br>UNITED STATES BUREAU OF RECLAMATION, *et al.*,<br><br>    Defendants.                   / | No. C 07-0259 SI<br><br>**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

On April 4, 2008, the Court held a hearing on the parties' cross-motions for summary judgment. After consideration of the parties' arguments and the administrative record, the Court hereby DENIES plaintiff's motion for summary judgment and GRANTS defendants' motion.[1]

**BACKGROUND**

Since the 1950s, the United States Bureau of Reclamation ("BOR") has authorized seven concessionaires to provide services to visitors at Lake Berryessa. The concessionaires conduct their business on federal land, and run seven resorts which provide long-term and short-term camping, trailer and mobile home sites, as well as marina access and a variety of amenities. By their own terms, the seven concession agreements expire between December 2007 and May 2009.

Plaintiff Berryessa for All is an unincorporated non-profit association comprised of families and individuals, sometimes called "permittees," who have seasonal or permanent homes at resorts surrounding Lake Berryessa. These families and individuals rent trailer and mobile home sites from the

---

[1] The Court has also considered plaintiff's June 10, 2008 letter and attachments (Docket No. 72).

seven private concessionaires. The long-term users do not have any contractual or other arrangements directly with the Bureau of Reclamation. *See* Finnegan Decl. ¶ 6. Plaintiff's members also include businesses located at or near the resorts. Plaintiff's members do not include the seven concessionaires.

Plaintiff filed this action on January 16, 2007, challenging a new management plan approved by BOR that is intended to go into effect once the current concession agreements expire. On June 2, 2006, BOR adopted its Record of Decision ("ROD") for the Future Recreation Use and Operations of Lake Berryessa, Solano Project, Napa, California, Mid-Pacific Region. The new management plan, known as the "Visitor Service Plan" (also "VSP ROD") followed the preparation and issuance of a Draft Environmental Impact Statement, dated October 2003, and a Final EIS ("FEIS"), released November 2005. The parties' cross-motions for summary judgment primarily address the adequacy of the FEIS.

The VSP ROD eliminates the long-term "exclusive use" of federal property at the Lake by trailer and mobile home users.[2] The VSP ROD provides for the development of new facilities and programs to better serve the short-term visitor. The VSP ROD requires that all long-term trailers and mobile homes be removed from federal property at the Lake and replaced with short-term facilities under a framework developed by BOR for each individual concession area. Some long-term permittees have erected permanent structures at the sites they rent from the concessionaires; those structures must be removed under the VSP ROD. The VSP ROD also includes a range of mitigation measures, including those designed to address hardship situations. The VSP ROD provides that after the current concession agreements expire, BOR will accept bids for new concession agreements which will focus on providing recreational facilities and services for short-term visitors. In November 2007 BOT received 6 proposals for 21 individual viable submissions for concessions contracts. Lucero Decl. ¶ 3.[3]

Plaintiff contends that BOR violated the National Environmental Policy Act, 43 U.S.C. §§ 4321 *et seq.*, by, preparing an inadequate FEIS. Specifically, plaintiff contends that the FEIS fails to take a

---

[2] According to BOR policy LND 04-02, "Exclusive use is any use that excludes other appropriate public recreation use or users for extended periods of time. Exclusive use includes, but is not limited to, boat docks, cabins, trailers, manufactured or mobile homes, structures, or amenities that are determined by Reclamation to be exclusive use."

[3] According to plaintiff's June 10, 2008 letter and the attachments, BOR has selected the winning bid but those contracts have not yet been finalized.

2

1 "hard look" at certain environmental impacts of the VSP ROD. Second, plaintiff argues that the FEIS
2 fails to adequately identify and describe mitigation measures. Third, plaintiff contends that the FEIS
3 relies on insufficient demand data. Finally, plaintiff argues that the BOR failed to fairly consider
4 reasonable alternatives.

**LEGAL STANDARDS**

**1.    Summary judgment**

Summary adjudication is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56©.

In a motion for summary judgment, "[if] the moving party for summary judgment meets its initial burden of identifying for the court those portions of the materials on file that it believes demonstrate the absence of any genuine issues of material fact, the burden of production then shifts so that the non-moving party must set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue for trial." *See T.W. Elec. Service, Inc., v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). In judging evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, and draws all inferences in the light most favorable to the non-moving party. *See T.W. Electric*, 809 F.2d at 630-31 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)); *Ting v. United States*, 927 F.2d 1504, 1509 (9th Cir. 1991). The evidence presented by the parties must be admissible. *See* Fed. R. Civ. P. 56(e). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *See Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

**2.    Review of administrative action**

Judicial review of final agency actions is governed by the Administrative Procedure Act

3

("APA"), 5 U.S.C. § 701 *et seq. See Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of the Navy*, 898 F.2d 1410, 1413 (9th Cir. 1990). The court "shall" set aside any agency decision that the Court finds is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The APA precludes the trial court reviewing an agency action from considering any evidence outside of the administrative record available to the agency at the time of the challenged decision. *See* 5 U.S.C. § 706(2)(E); *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985); *Havasupai Tribe v. Robertson*, 943 F.2d 32, 34 (9th Cir. 1991).

The Court must determine whether the agency decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated on other grounds, Califano v. Sanders*, 430 U.S. 99 (1977). The Supreme Court has explained that an agency action is arbitrary and capricious if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Although the arbitrary and capricious standard "is narrow and presumes the agency action is valid, . . . it does not shield agency action from a 'thorough, probing, in-depth review.'" *Northern Spotted Owl v. Hodel*, 716 F. Supp. 479, 481-82 (W.D. Wash. 1988) (citations omitted). The Court cannot, however, substitute its judgment for that of the agency or merely determine that it would have decided an issue differently. *See Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 377 (1989).

**DISCUSSION**

**1.    Standing**

Defendants renew their challenge to plaintiff's standing, contending that plaintiff's injury flows only from the expiration of the concession agreements, and that plaintiff has not identified any environmental injury that flows from the implementation of the VSP ROD. Defendants' arguments are largely the same as those advanced in their unsuccessful motion for judgment on the pleadings.

4

"[T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth*, *Inc. v. Laidlaw Envt'l Servs. Inc.*, 528 U.S. 167, 180-81 (2000). As discussed in the Court's order denying defendants' motion for judgment on the pleadings, the Court finds that plaintiff has standing because the complaint alleges that defendant failed to comply with NEPA and the APA, and the relief sought in the complaint – defendant's compliance with NEPA and the APA – redresses that injury.

Defendants also contend that plaintiff lacks prudential standing because the declarations submitted by plaintiff allege injuries that are outside the zone of interests that NEPA was enacted to protect. Defendants are correct that a plaintiff alleging purely economic injury does not have standing under NEPA. *See Nev. Land Action Ass'n v. United States Forest Serv.*, 8 F.3d 713, 716 (9th Cir. 1993). "A plaintiff can, however, have standing under NEPA even if his or her interest is primarily economic, as long as he or she also alleges an environmental interest or economic injuries that are causally related to an act within NEPA's embrace." *Ranchers Cattleman Action Legal Fund United Stockgrowers of America v. U.S. Dep't of Agric.*, 415 F.3d 1078, 1103 (9th Cir. 2005) (internal quotation and citation omitted). The zone of interests test is "not meant to be especially demanding." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987).

Here, plaintiff's members have submitted declarations stating that they actively use the lake for water skiing, fishing, and outdoor recreation, and that these interests will be harmed by implementation of the VSP ROD. These interests are within the zone of interests protected by NEPA. *See Ocean Advocates v. United States Army Corps of Eng'rs*, 402 F.3d 846, 861 (9th Cir. 2005) (holding organization that sought to avoid harmful effects of oil spills had standing under NEPA); *Northwest Envtl. Def. Ctr. v. Bonneville Power Admin.*, 117 F.3d 1520, 1528-29 (9th Cir. 1997) (holding organizations had Article III standing based on declarations from members stating that recreational interests would be harmed).

**2.    Merits of NEPA claim**

The National Environmental Policy Act ("NEPA") requires federal agencies to analyze the environmental impacts of a proposed action before proceeding with that action. *See* 42 U.S.C. § 4332(2)(c). Under NEPA and the regulations promulgated thereunder by the Council on Environmental Quality ("CEQ"), federal agencies must prepare and circulate to the public a comprehensive environmental impact statement ("EIS") so that the environmental impacts can be considered and disclosed to the public during the decision-making process. *See* 40 C.F.R. §§ 1501.2, 1502.5. In the EIS, the agency must identify direct, indirect, and cumulative impacts of the proposed action, consider alternative actions (including the alternative of taking no action) and their impacts, and identify all irreversible and irretrievable commitments of resources associated with the action. *See* 42 U.S.C. § 4332(2); 40 C.F.R. § 1502.14(d).

Plaintiff contends that defendants violated NEPA in four respects. First, plaintiff contends that the FEIS fails to take a "hard look" at certain environmental impacts of the VSP ROD. Second, plaintiff argues that the FEIS fails to adequately identify and describe mitigation measures. Third, plaintiff contends that the FEIS relies on insufficient demand data. Finally, plaintiff argues that the BOR failed to fairly consider reasonable alternatives to the VSP ROD.

**A.    Consideration of environmental impacts**

The Court reviews the EIS to determine whether the BLM took a "hard look" at the environmental consequences of its action. *See Marble Mountain Audubon Soc'y v. Rice*, 914 F.2d 179, 182 (9th Cir. 1990) (citing *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976)). "The role of the courts is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." *Balt. Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 97 (1983). NEPA "places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action." *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council*, 435 U.S. 519, 553 (1973).

**(1)    Removal of trailers and associated infrastructure**

Plaintiff contends that the FEIS did not adequately address the environmental impacts from the removal of trailers and associated infrastructure. The FEIS states:

> [I]t is assumed that new development at each resort would include the eventual removal and/or rehabilitation and construction of various structures and supporting infrastructure, as necessary. This development is anticipated to include both the excavation and relocation of earth materials with an unknown amount of cut and fill expected to occur at each resort site, depending on individual design requirements. There would be a potential for erosion to occur during these activities. However, with the use of best management practices, the potential effects from development related erosion would be considered minor. Corrective measures would include adhering to all design and construction criteria to insure a separation of construction areas from adjacent sources of water.

FEIS at 91. The FEIS also discusses procedures to prevent erosion, states that all construction will comply with various applicable laws and regulations, and that further site-specific NEPA analysis may be necessary. *Id.* at 91-110; VSP ROD at 5, 10, 12, 14-15.

Plaintiff has submitted a number of documents outside the administrative record in an effort to argue that BOR was or should have been aware of the potential impacts created by removal of the trailers. *See* Iwama Decl. Ex. A-F.[4] These documents include a "Trailer Site Removal Plan" issued by BOR to long-term permittees prior to the issuance of the ROD (Ex. A); letters informing long-term permittees that BOR has "re-defined the development and management of visitor services (commercial and non-commercial) to support traditional, short-term, non-exclusive, and diverse outdoor recreational opportunities," and that "this will require the permanent removal of all privately owned trailers, mobile homes, and all other personal property from Federal Land" (Ex. B); letters from BOR to permittees regarding removal of trailers and infrastructure (Ex. C-E); and internal BOR emails regarding removal of trailers and associated infrastructure (Ex. F).

In one of the exhibits, a letter dated December 27, 2007 to a permittee, BOR states, in relevant part,

---

[4] Plaintiff contends that these documents should be considered by the Court because, although outside of the administrative record, they help understand plaintiff's claim that BOR failed to adequately discuss the potential impacts of trailer removal. Similarly, defendants have submitted extra-record evidence, such as the Declaration of Pedro Lucero, which in part responds to plaintiff's extra-record submission. Both sides have objected to the other's submission of and reliance on extra-record documents. The Court will consider these extra-record documents and declarations because they are necessary to "determining whether the agency has considered all relevant factors or has explained its course of conduct or grounds of decision." *Nat'l Audubon Soc'y v. U.S. Forest Serv.*, 46 F.3d 1437, 1447 n.9 (9th Cir. 1993).

7

> Pursuant to the Record of Decision issued in June of 2006, privately owned long-term trailers, mobile homes, and associated personal property currently located within the concession areas must be permanently removed from Federal property at Lake Berryessa before the end of the current concession contract. The following information is provided in response to various questions Reclamation has received concerning the removal process.
>
> In summary, Reclamation environmental specialists have performed an environmental assessment of each site at Lake Berryessa pursuant to the National Environmental Policy Act of 1969 (NEPA) and have determined that your trailer or mobile home is cleared for removal. Therefore, permittees or concession contractors are no longer required to complete a project proposal and wait for Reclamations approval for the removal of personal property.
>
> Effective immediately, we have streamlined the notification and removal process down to four basic steps:
>
> 1. Notify the concession contractor in advance of your scheduled removal date pursuant to your permit.
>
> 2. The concession contractor will then issue you a Project Decision Page with a list of stipulations to be followed during the removal. (Enclosure 1)
>
> 3. The concession contractor will notify Reclamation using the "TRAILER REMOVAL NOTIFICATION" form. (Enclosure 2)
>
> 4. Reclamation will monitor the removal process to ensure the removal stipulations are adhered to.
>
> No other approval is required for you to begin arrangements for removal of your trailer or mobile home and all associated personal property. . . .

Iwama Decl. Ex. D. The "Project Decision Page" enclosed with this letter lists 14 "conditions of site disturbance and/or best management practices (BMPs) that would apply to the permanent removal of trailers." *Id.* Those conditions include, *inter alia*:

- All permittees/concession contractors must comply with state, federal, and local laws and regulations; including, but not limited to those laws and regulations related to hazardous waste removal and any other health and safety hazard or concern.

- Concession contractors are to instruct all permittees that <u>minimal disturbance</u> to sites is acceptable upon removal of trailers. Minimal disturbance is characterized by the following:

- No removal of vegetation, erosion control devices, retaining walls, or other permanently affixed structures that would cause more than minimal disturbance to the ground (e.g., trailer pads, driveways, etc.).

. . .

- Trailers and appurtenances (shed, fencing, awnings, stairs, boat carports, side building, and decks) will be removed with hand tools or by mechanical methods

8

> that create no more than minimal ground disturbance, provided it is appropriate to the situation (e.g., low impact construction equipment may be necessary to remove trailers to avoid health and safety issues).
>
> . . .
>
> • Implementation of erosion and sedimentation control Best Management Practices must be used at all times before, during, and after demolition.

*Id.* (emphasis in original).

A letter dated February 22, 2008 from BOR to a permittee states,

> Per your request I have enclosed another copy of the clearance letter issued to you in December 2007, which includes the Project Decision Page and the authorization for you to remove your trailer/mobile home from Federal lands at Lake Berryessa. Also enclosed is a copy of the Categorical Exclusion Checklist (CEC) from the Central California Area Office which provides the details and concurrence for the environmental assessment performed at Lake Berryessa pursuant to the National Environmental Policy Act compliance procedures.
>
> Reclamation has inspected your trailer site and has determined that removal of your trailer falls within the Categorical Exclusion.
>
> It is important to note that the CEC is conditioned upon adhering to the stipulations in the Project Decision Page for removal of your trailer and all appurtenances. Any failure to follow the removal stipulations negates this approval. Reclamation will monitor the removal of your trailer, and if during the monitoring our inspectors notice any environmental concerns undetected during the assessment, Reclamation will conduct further environmental analysis. Additional stipulations may be applied as needed.
>
> As a reminder, you will be held responsible for adhering to the stipulations and/or best management practices that apply to the removal of your personal property.
>
> Additional site evaluations will be conducted during and after you remove your personal property to ensure that compliance with environmental regulations have been followed.

*Id.* Ex. E.

In the internal BOR emails submitted by plaintiff, which appear to date from September 2006, BOR staff discuss the trailer removal process, and the potential problems associated with owners removing certain infrastructure. *See id.* Ex. F at 41154 (email from Pete Lucero stating, "A problem we have with removal of pads, retaining walls and other supporting devices such as footings for decks and trailers is that we do NOT want the owner to remove these items because of the potential for ground disturbance, broken utility lines, the need for Storm Water Pollution Prevention Plan, permits associated with demo activities etc.").

In response, defendants argue that the VSP ROD contemplated that implementation of the project may require further site-specific NEPA analysis, and that the documents submitted by plaintiffs

9

1 show that this is exactly what has happened. Defendants have also submitted the Declaration of Pedro
2 Lucero, Chief of the Recreation Resources Division, Central California Office of the BOR, which
3 explains the "Categorical Exclusion" process that BOR used in analyzing the site-specific trailer
4 removal under NEPA.[5]

5 With regard to the trailer removal, BOR invoked a CE which covers minor construction activities
6 associated with authorized projects that are designed to correct environmental problems or that merely
7 augment or supplement, or are wholly within, existing facilities. 516 DM 14.5 (attached as Ex. A to
8 Glazer Decl.). Mr. Lucero states,

> Reclamation has determined that the action of trailer removal at Lake Berryessa is subject to Categorical Exclusion . . . because, with very few exceptions, trailer removal involves minimal disturbance, is designed to correct unsatisfactory environmental and safety conditions, is wholly within an existing facility, and is located on pre-disturbed land. All trailer sites were visually inspected to determine the applicability of the CE, in accordance with Categorical Exclusion Checklist ("CEC") #743. Only a few (12) were found not to satisfy the requirements of CEC #743, because of particular conditions existing at those sites. Further environmental review has been conducted on those 12 sites, and all have subsequently been cleared for removal under individual CECs containing requirements specific to those sites. . . . All trailer sites at the Lake Berryessa concession areas have been reviewed and cleared for removal, providing that trailer owners comply with the conditions and stipulations required under the applicable CECs.
>
> Conditions and stipulations for removal set forth in CEC #743 include limitations on ground-disturbing activities, no removal of retaining walls and other supporting structures, and other similar requirements. The additional, individual CECs contain requirements addressing particular concerns that the 12 sites for which those individual CECs were developed. Reclamation has been monitoring ongoing trailer removals and will continue to do so to ensure compliance with these conditions.
>
> Since 2004, nearly 550 trailers have been successfully removed from the concession areas. Since the VSP ROD was issued in June 2006, approximately 350 trailers have been successfully removed and, of those, nearly 300 have been removed in the last 12 months.

Lucero Decl. ¶¶ 3-5. The individual CECs for the 12 sites requiring further environmental review are

---

[5] The Council on Environmental Quality has promulgated NEPA regulations that authorize an agency to use a Categorical Exclusion ("CE") for a "category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulations." *West v. Sec'y of Dept. of Transp.*, 206 F.3d 920, 927 (9th Cir. 2000) (citing 40 C.F.R. § 1508.4). "Neither an EIS nor an [Environmental Assessment] is required for actions categorically excluded from NEPA review." *Id.* (citing 40 C.F.R. § 1507.3(b)(2)(ii)). "An agency's determination that a proposed action falls within a CE is reviewed under the arbitrary and capricious standard and the agency's interpretation of the CE is given controlling weight unless plainly erroneous or inconsistent with the terms used in the regulation." *Public Citizen v. DOT*, 316 F.3d 1002, 1029 (9th Cir. 2003), *rev'd on other grounds sub nom. DOT v. Public Citizen*, 541 U.S. 752 (2004) (citations omitted).

attached as Exhibit A to the Lucero declaration.

The Court earlier held that NEPA does not require a site-specific analysis of removal and demolition in the EIS. *See City of Alexandria v. Slater*, 198 F.3d 862, 869-71 (D.C. Cir. 1999) (holding "terseness of the Administration's discussion of construction impacts" complied with NEPA so long as agency considered environmental impacts on a general level); *Friends of Yosemite Valley v. Norton*, 348 F.3d 789, 800 (9th Cir. 2003) ("An EIS for a programmatic plan . . . must provide 'sufficient detail to foster informed decision-making,' but 'site-specific impacts need not be fully evaluated until a critical decision has been made to act on site development.'") (quoting *N. Alaska Envt'l Ctr. v. Lujan*, 961 F.2d 886, 890-91 (9th Cir. 1992)). The Court reiterates that holding and finds that the FEIS adequately discussed and considered the environmental impacts from the removal of trailers and associated infrastructure. Further, the extra-record documents show that BOR has monitored trailer removals and that site-specific analysis has occurred as contemplated by the FEIS.

### (2)    **Traffic impacts**

Plaintiff also contends that the FEIS failed to adequately address traffic concerns arising from implementation of the VSP ROD. Specifically, plaintiff argues that the FEIS relied on an outdated 1992 traffic study, and that this deficiency was noted by the California Department of Transportation in a March 4, 2004 letter. Plaintiff has submitted a copy of that letter, which states, *inter alia*, that "[t]he 1992 [traffic] study is outdated and should be revised based on recent traffic counts obtained during peak seasonal use." Siroka Decl. Ex. B (Docket No. 24).

The FEIS concluded that the implementation of the VSP ROD would likely have minor, if any, overall long-term effects on traffic. FEIS at 124. The FEIS states,

> Under Alternative B, traffic associated with the resorts would decline temporarily once the long-term trailers were removed and only a limited number of short-term facilities (in the initial development phase) were available for public use. . . .
> However, once the build-out was completed and visitors became aware of the camping, meeting and other amenities offered at the upgraded resorts, traffic would increase and perhaps parallel current levels. The no-impact in boat-in camping program proposed for concessionaire management might also promote a slight rise in traffic once its popularity became established, but this would occur mainly during the peak season, and especially during holiday weekends.
>
> [further discussion of specific areas at Lake Berryessa and anticipated traffic impacts]

11

> On the whole, it is anticipated that the proposals under this alternative would not create significant impacts to traffic circulation in the area, including any short-term increase from the removal of trailers from the resorts. This temporary change in traffic levels would be considered minor compared to the historic level of traffic and would have a negligible effect on the overall deterioration of Reclamation or county roadways. Future resort roadway needs would be addressed in additional site-specific environmental analysis.

*Id*.

The FEIS responded to March 1, 2004 letter by stating that "Reclamation will conduct ongoing traffic monitoring and will work closely with Caltrans and Napa County to share traffic data and to adopt measures to improve traffic circulation impacts and meet appropriate laws, rules and regulations." FEIS, Attachment 19 at 19-24. Mr. Lucero also states in his declaration:

> Reclamation has coordinated with the California Department of Transportation ("Caltrans") concerning traffic issues relating to implementation of the VSP ROD. Reclamation has considered comments on the draft Environmental Impact Statement submitted by Caltrans[6] and has since informed Caltrans that any updated traffic analysis, if needed, should await further development of plans for new concession areas under the VSP. A letter to that effect was sent from Michael Finnegan, Area Manager for Reclamation's Central California Area Office, to Caltrans.

Lucero Decl. ¶ 7. The letter referenced in Mr. Lucero's declaration is attached as Exhibit B to the declaration; that letter states, *inter alia*, that Caltrans representatives "expressed to [BOR's] consultant that they concurred with the [1992] analysis and didn't feel the traffic situation had changed much since that time." Lucero Decl. Ex. B. That letter, stamped October 2, 2006, also states,

> At the time Reclamation was developing the Final EIS, expiration of the concession contracts in 2008-2009 was still several years in the future. Since publication of the ROD in June 2006, we are now developing a prospectus to solicit proposals for new concession operations, and we intent to initiate the solicitations as quickly as possible. Early award of new contracts will give us time to complete site-specific environmental analysis, as applicable and appropriate, and other pre-development activities prior to the expiration of the current concession contracts. Since the prospectus is not yet completed and new contracts have yet to be developed, it is still too soon to determine what specific work will be required in the concession areas; therefore, it is also too soon to know how any work will affect the roadways/traffic.

*Id*.

The Court finds that the FEIS adequately considered traffic concerns in connection with the VSP ROD. It was not arbitrary or capricious to rely on 1992 traffic data, particularly when Caltrans representatives informed BOR that the "traffic situation" was essentially unchanged. In addition, it was

---

[6] The comments consist of the March 1, 2004 letter.

reasonable for BOR to state that it would conduct ongoing monitoring of traffic and coordinate efforts with Caltrans and the County of Napa as the new concession plans are developed.

### (3)    Local socio-economic impacts

Plaintiff also contends that the FEIS is deficient because it did not adequately consider the socio-economic impacts of the elimination of long-term use at Lake Berryessa. In connection with the preparation of the Draft EIS, BOR commissioned a feasibility analysis by Dornbusch and Associates. Plaintiff argues that the Dornbusch analysis is flawed because it based its assumptions about economic impacts to the entire County of Napa, without consideration of the more localized economic region of the Lake and related gateway communities. Plaintiff also contends that the Dornbusch report, and thus the FEIS, is not based on quantitative data; plaintiff contends that the Dornbusch report recognizes that there is insufficient data to evaluate the feasibility of, and therefore the potential socioeconomic impacts flowing from, Alternative B. For support, plaintiff relies on a declaration provided by a consultant, Alan Summers, who was hired along with another consultant (Michael Summers) to analyze the Dornbusch report.[7] Mr. Summers has attached a copy of Summers & Summers report, dated October 25, 2004, to his declaration, and incorporates the findings and conclusions of the 2004 report. *See* Docket No. 16, Ex. 11.

The Court finds that the FEIS adequately considered the socio-economic impacts of the VSP ROD. The FEIS discusses in detail the potential socio-economic impacts of the VSP ROD and the other alternatives at pages 161-96. The FEIS examines, *inter alia*, impacts to population, employment, income, concession services and activities (including the impact on local businesses), accessibility for people with disabilities, and environmental justice. *Id*. The FEIS concludes that, although impacts may be most noticeable at the area immediately surrounding the Lake, on a regional scale they are either not measurable or are offset by positive benefits as patterns of use at the Lake change. *See, e.g.* FEIS at 186 ("Short-term impacts to concessionaires would be adverse and significant under the Preferred Alternative. . . . [T]here would be significant adverse long-term effects on trailer permittees, who would

---

[7] During the notice and comment period for the EIS, the concessionaires hired Summers & Summers to analyze the EIS. FEIS Attachment 19 at 19-60.

permanently forfeit their vacation sites. Long-term uses related to new facilities would also offer substantial benefits to a rehabilitated environment, the visiting public and to commercial interests outside the reservoir . . . Overall, these effects would be beneficial and significant.").

The FEIS also provides a detailed, 12 page, point-by-point response to the 2004 Summers & Summers report. FEIS Attachment 19 at 19-60 to 19-72. In its general response to the Summers & Summers report, BOR noted that it was never contemplated that the long-term use at Lake Berryessa would continue in perpetuity:

> Reclamation does not agree with the tenets outlined in the [Summers report] that indicate there will not be an economically feasible business opportunity without retention of the current long-term uses. Furthermore the documentation by Summers & Summers and other portions of the ROP disregard certain salient factors regarding the issues of feasibility and appropriate use of Federal lands at Lake Berryessa as the current concession contracts come to the legal expiration of their 50-year terms. . . .
>
> Since the current contracts were developed and signed over 45 years ago, the eventual expiration of those contracts and the requirement for Reclamation to recognize the need for a change in focus has been evident to both parties of the contracts (Reclamation and the individual concessionaires). Similarly, the Public Use Plan (PUP) has been clear for the last 48 years and the Amendments to that PUP for the last 30 years as to the specific preferences for short-term use and the apparent end to the current long-term focus. . . . None of these NEPA compliant and/or legal documents indicate that the original concessionaires have any preference or heightened expectation of remaining into the next term. (They can compete with others.) Similarly, there has not been any indication that they original facilities, service, and programs would continue in perpetuity. In fact, there are many indications in the PUP amendments and the RAMP that the existing reliance on long-term trailers was only continuous through the current contract terms ending in 2008-2009.

*Id*. at 19-69. BOR also explained why the Summers' proposal was inconsistent with the goal of opening Lake Berryessa up to the short-term visitor:

> [Summers] propose to retain long-term trailers in essentially the same configuration as presently exists in all seven of the concessionaire areas and along the same lakeshore locations. The ROP promotes the concept of letting trailer owners rent their trailers out to the public at those times they do not wish to be there themselves. The ROP and S&S suggests also responding to the needs of short-term users by adding a significant number of new facilities – campsites, RV parks, cabins, boat rental slips, launch ramps, concessionaire-owned trailer rentals, food and beverage outlets, etc. In short, it proposes a scenario that would provide the apparent substantial needs and support facilities for both long-term and short-term users. . . .
> Reclamation will not consider the commercial use of existing private trailers as such arrangements do not meet the expectations of the short-term public and appear to be a fabricated approach to retain trailers and provide some level of appeasement for short-term use. . . . Furthermore, the general short-term public has expressed significant disapproval and negative appeal with the very proximity of private long-term trailers and no interest in vacationing within those installations.
> . . . .

14

> Regardless of the Summers and Summers input and their earlier evaluation of the Dornbusch feasibility report, Reclamation does not agree with the philosophy that removal of the long-term trailers will destroy the economic feasibility for Lake Berryessa concessionaires. Lake Berryessa, because of its size, physical attraction, and proximity to large population centers, presents an outstanding economic opportunity if properly developed without long-term trailer usage.
>
> The ultimate economic viability test will be provided by qualified interested bidders to a new concessions opportunity. These companies must consider the economics in advance of submitting their offers and committing their funds. Reclamation believes that this interest, which has already been expressed, will demonstrate a more important level of confidence or lack thereof than the theoretical work provided for Reclamation by Dornbusch or for the ROP by Summers and Summers.

*Id*. at 19-71.

### B.  Mitigation measures

Plaintiff contends that the FEIS does not adequately identify and describe mitigation measures to address adverse environmental impacts of the removal of trailers and associated infrastructure. Plaintiff's contentions largely repeat the arguments discussed *supra*, namely that it was inadequate for BOR to state that it would implement "Best Management Practices" and conduct site-specific environmental analysis as necessary. For the reasons discussed earlier, the Court finds that the FEIS's discussion of mitigation measures was sufficient. *See Bering Strait Citizens v. U.S. Army Corps of Eng'rs*, 511 F.3d 1011, 1023 (9th Cir. 2008).

### C.  Demand data

Plaintiff also contends that the FEIS relies on insufficient and outdated visitor demand data. The FEIS discusses, *inter alia*, current and predicted visitation numbers, carrying capacity at the Lake, "area reservoir recreation demand," the current visitor profile, and the visitor experience. FEIS at 134-44. Based upon historical visitation numbers and various studies conducted between 1987 and 1998, the FEIS concludes that visitation levels will continue to increase, and that there is currently an unmet demand for short-term recreation. *Id*. Plaintiff argues that these data sources are "ancient" and provide a "thin reed" to justify the major changes wrought by the VSP ROD.

The Court finds that the FEIS's detailed discussion of visitorship trends and visitor needs is more than adequate to satisfy NEPA's requirement of informed decisionmaking. The case relied on by

15

1 plaintiff, *NRDC v. United States Forest Service*, 421 F.3d 797 (9th Cir. 2005), is inapposite. In that
2 case, the Forest Service admitted that it relied on flawed market demand analysis which doubled the
3 demand projection scenarios. *Id.* at 807. The Ninth Circuit held that the market-demand error was not
4 harmless because that mistake had some bearing on the Forest Service's decision to adopt the selected
5 alternative. *Id.* at 808. Here, plaintiff has not identified any mistake or flawed analysis, but instead
6 simply asserts that the studies and surveys are too old. The FEIS itself recognizes that "[w]ith the
7 vacillating nature of visitation at Lake Berryessa in the past and the current uncertainty with the world
8 political and economic climate, undertaking to forecast long-term visitor trends in visitation numbers
9 is particularly difficult." FEIS at 134.

### D.  Alternatives

12 NEPA requires that an EIS include "alternatives to the proposed action." 42 U.S.C.
13 § 4332(2)(C)(iii). NEPA regulations provide that an EIS must include "the alternative of no action" as
14 well as "all reasonable alternatives." 42 U.S.C. § 4332©; 40 C.F.R. § 1502.14(a), (d). BOR considered
15 and analyzed four alternatives in the FEIS. Alternative A was the "no action" alternative. Alternative
16 B was the "preferred alternative" and required complete and permanent removal of all long-term sites
17 and large scale redevelopment of each of the resort sites by private concessionaires to emphasize short-
18 term use. Alternative C was similar to Alternative B, but would also reintroduce some mobile homes
19 in limited areas. Alternative D required permanent removal of long-term sites, and BOR would take
20 over management of two of the resort sites; redevelopment to encourage short-term use, but overall the
21 level of facilities and services would be reduced to provide a more rustic recreational experience. BOR
22 adopted Alternative B with some modifications. *See generally* FEIS at 20.

23 Plaintiff contends that the FEIS's stated purposes are unreasonably narrow and tailored in such
24 a way so that only the BOR's preferred alternative, Alternative B, would be selected. "The stated goal
25 of a project necessarily dictates the range of 'reasonable' alternatives and an agency cannot define its
26 objectives in unreasonably narrow terms." *City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*, 123
27 F.3d 1142, 1155 (9th Cir. 1997). The Court must determine whether the EIS's "purpose and need" was
28 reasonable, and then whether the VSP ROD was reasonable in light of the cited project goals. *See id.*

> As stated in the FEIS, the primary purpose and need for the proposed action was
>
> to remedy over four decades of management practice under which prime recreational areas have been reserved for long-term trailer site permittees, to the exclusion of the majority of visitors to Lake Berryessa. Such practice is in conflict with modern Reclamation policies regulating exclusive use of public property.

FEIS at 33. The Court concludes that this is a reasonable purpose and is not so narrowly tailored such that only Alternative B would be selected. Indeed, three of the four alternatives (B-D) would have met this goal, as all three alternatives required removal of long-term sites and redevelopment to encourage short-term use. Plaintiff is correct that Alternative A, is inconsistent with the BOR's goal. However, as discussed throughout the FEIS and the administrative record, long-term exclusive use of Federal land at the Lake was never intended to continue in perpetuity and is contrary to BOR policies. Moreover, the long-term trailer sites had created an environmentally unsound and potentially hazardous situation. *See* FEIS at 22, 104, 110, 165, 196-98 (discussing deteriorating sewage treatment facilities and serious and systemic fire hazards). In addition, under Alternative A, short-term users are limited to a few areas. *Id*. at 133-34.

Plaintiff contends that the FEIS unreasonably rejected other alternatives, such as Alternative D, as well as other alternatives that would have allowed long term sites. The NEPA regulations require that an agency "[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated." 40 C.F.R. § 1502.14(a). Such rigorous exploration and objective evaluation of all reasonable alternatives is "the heart of an EIS." *Natural Res. Def. Council v. U.S. Forest Serv.*, 421 F.3d 797, 813 (9th Cir. 2005). As the Ninth Circuit has held,

> In order to be adequate, an environmental impact statement must consider not every possible alternative, but every reasonable alternative. The existence of a viable but unexamined alternative renders an environmental impact statement inadequate. The question for the district court, therefore, is whether the [omitted alternative] was reasonable.

*Citizens for a Better Henderson v. Hodel*, 768 F.2d 1051, 1057 (9th Cir. 1985) (internal citations omitted). Put differently, "[t]he touchstone for [the court's] inquiry is whether an EIS's selection and discussion of alternatives fosters informed decision-making and informed public participation." *California v. Block*, 690 F.2d 753, 767 (9th Cir. 1982).

The Court finds that the FEIS's selection and discussion of alternatives is adequate. It was reasonable for the FEIS not to select Alternative D, as that alternative would have provided somewhat fewer amenities than Alternative B, and thus would have reduced the services available to the public, and also would have required a greater management role on the part of BOR because 2 of the 7 concession areas would be operated by BOR.

Plaintiff complains that the FEIS did not include additional alternatives that allowed long-term use, such as "Alternative A+," which was similar to the No Action Alternative but would also require bringing all trailer sites into compliance with applicable health, safety and environmental regulations, codes and policies, while still authorizing the continued exclusive long-term trailer use in the same locations. Alternative A+ also would have improved facilities and opportunities for short term visitors. AR 22737-823. The FEIS concluded that this alternative need not be considered in further detail because "this proposal is nearly identical to Alternative A (No Action)." FEIS at 39. This is appropriate under NEPA. "An agency need not, therefore, discuss alternatives similar to alternatives actually considered, or alternatives which are "infeasible, ineffective, or inconsistent with the basic policy objectives for the management of the area." *Northern Alaska Env'l Center v. Kempthorne*, 457 F.3d 969, 978 (9th Cir. 2006) (quoting *Headwaters, Inc. v. Bureau of Land Mgmt.*, 914 F.2d 1174, 1180-81 (9th Cir. 1990)).

## CONCLUSION

For the foregoing reasons, the Court DENIES plaintiff's motion for summary judgment, and GRANTS defendants' motion for summary judgment. (Docket Nos. 58 & 60). The Court DENIES plaintiff's motion to strike. (Docket No. 64).

**IT IS SO ORDERED.**

Dated: July10, 2008

SUSAN ILLSTON
United States District Judge